**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| MARIE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-01215-TWP-MPB |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT AND MOTION TO STRIKE**

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant the United States of America ("Defendant") (Filing No. 61), as well as a Motion to Strike filed by the Defendant (Filing No. 67). Plaintiff Marie Smith ("Smith") filed this lawsuit against the Defendant alleging that she suffered respiratory failure as a result of a narcotics overdose, following hip replacement surgery at the U.S. Department of Veterans Affairs (the "VA") Richard L. Roudebush VA Medical Center (the "VA Hospital") in Indianapolis, Indiana. She asserts a single claim for medical malpractice and requests damages for her injuries. The Defendant seeks summary judgment arguing there is no evidence to support the breach and causation elements of a medical malpractice claim. The Defendant also filed a Motion to Strike Smith's January 29, 2019 expert report. For the reasons stated below, the Court **denies** the Defendant's motion to strike and **grants** the request for summary judgment.

## I.  BACKGROUND

As required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Smith as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir.

2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The facts relative to Smith's course of medical treatment are undisputed. ([Filing No. 73 at 2](#)).

Smith has a lengthy medical history including diagnoses for heart, kidney, and thyroid issues, fibromyalgia, chronic pain, arthritis in the spine and knees, high blood pressure, post traumatic stress disorder, various allergies, and multiple surgeries ([Filing No. 61-36 at 13](#)–16). She began having problems with her right hip in April or May 2015 after having a fall on her stairs. *Id.* at 29–30.

On May 8, 2015, Smith was seen as a walk-in patient by primary care physician Dr. Umer Bhatti. Smith reported to Dr. Bhatti that,

> [S]he was in her usual state of health till [sic] a month ago at which point she had a fall, a recurrent issue for her, due to her knees giving out. She landed on her hips [sic]. Since that time she has experienced acutely worsened lateral hip pain that is throbbing, worse when lying on the side. The pain is so severe that it interferes with her sleep and limit[s] her daily activities particularly housework.

([Filing No. 61-3 at 1](#).) She was referred to be seen in the rheumatology clinic for cortisone injections, her prescription for Tramadol was increased, and she was instructed to keep her previously-scheduled appointment with the orthopedics clinic. *Id.* at 4.

On May 21, 2015, Smith saw Dr. Saad Tariq in the rheumatology clinic and requested cortisone injections for her hips. It was observed that she had marked tenderness with palpation to the hips. Thus, Dr. Tariq administered cortisone injections to Smith's hips ([Filing No. 61-5 at 1](#)–3). A couple of months later, on August 10, 2015, Smith presented to primary care physicians Dr. Asm Chowdhury and Dr. Ahdy Helmy and reported that her chronic pain in her hips and knees was unchanged. She was directed to continue using lidocaine patches, venlafaxine, and Lyrica, and to take Tramadol as needed for pain ([Filing No. 61-6 at 1](#), 5–6).

Three months later, on November 10, 2015, Smith called the VA Hospital and left a voicemail message because she was experiencing a great deal of pain and her Tramadol was not helping. She requested a new and stronger prescription. A nurse returned her telephone call and learned that Smith had been using morphine approximately a year earlier but had been changed to Tramadol. Smith reiterated that Tramadol was not helping her pain, and she indicated that she wanted a stronger medication. The nurse said that she would forward the request to the doctor. On November 12, 2015, Smith went in person to the primary care clinic, requested different pain medication, and indicated that the Tramadol was making her itch. She was offered an appointment with the doctor for the following week, but she requested to be seen sooner as a walk-in patient. The following day, on November 13, 2015, Smith saw primary care physician Dr. Teela Crecelius for hives from taking Tramadol. She reported that she had taken Tramadol without incident for some time, but then hives developed on her abdomen, back, and arms a few days earlier, and the itching was not relieved by Benadryl. Dr. Crecelius instructed Smith to continue taking Effexor and Lyrica, discontinue taking Tramadol, and begin taking desipramine (Filing No. 61-7 at 1–2; Filing No. 61-8 at 1; Filing No. 61-9 at 1).

On December 17, 2015, Smith presented to Dr. Steven Hugenberg in the rheumatology clinic with complaints of right hip pain that had developed in the previous few weeks. She reported that it was painful to lie on her side. Dr. Hugenberg provided a steroid injection in her right hip and instructed her to rest her hip for the next 48 hours (Filing No. 61-10 at 1–3).

On May 25 and 26, 2016, Smith called the VA Hospital complaining of hip arthritis that was flaring up and making it so that she could not sleep on her right side. She requested a consultation with orthopedics (Filing No. 61-11 at 1). On June 1, 2016, Smith again called the VA Hospital and requested to be seen in the orthopedics clinic about her right hip pain. Because she

already was being treated by the orthopedics clinic for knee pain, Smith was instructed to call the orthopedics clinic directly for an appointment regarding her hip pain (Filing No. 61-12 at 1). Two days later, on June 3, 2016, Smith was seen in the orthopedics clinic by nurse practitioner Deborah Vandevender ("NP Vandevender") for her right hip pain. She complained that her pain increased with sitting for long periods, walking, and standing. NP Vandevender obtained x-rays of Smith's hips and recommended a hip arthrogram with a steroid injection (Filing No. 61-13 at 1). On June 21, 2016, Smith received the hip arthrogram with a steroid injection, and following the steroid injection, she reported that her "hip pain decreased from 5/10 to 0/10." (Filing No. 61-14 at 1.)

On July 20, 2016, Smith was seen by nurse practitioner Shauna Query in the orthopedics clinic as a follow-up to her hip injection. She reported that the steroid injection provided 80% relief for three weeks, but she was still limited in her activity because of hip pain. After talking with orthopedic surgeon Dr. Mark Webster about the risks and benefits of a total hip replacement, Smith decided to proceed with surgery (Filing No. 61-15 at 1).

Approximately one month later, on August 18, 2016, Smith underwent the right total hip replacement surgery. The surgery was performed by Dr. Mark Webster, Dr. Nathan Bowers, and Dr. Gregory Slabaugh. The surgery was successful without any complications, and she remained in stable condition (Filing No. 61-16 at 1). In order to manage the pain after the surgery, Smith was ordered ketorolac 15 mg intravenously every six hours, morphine sustained release 15 mg by mouth every twelve hours, and morphine immediate release 15 mg by mouth every four hours as needed (Filing No. 61-17; Filing No. 61-18). In accordance with the medication orders, Smith was administered morphine on the following dates and times: morphine immediate release on August 18 at 4:53 p.m. and on August 19 at 4:05 a.m., 9:15 a.m., and 1:17 p.m.; and morphine

sustained release on August 18 at 11:16 p.m. and on August 19 at 9:16 a.m. and 10:34 p.m. ([Filing No. 61-19 at 1](#)–3).

In the early morning hours of August 20, 2016, Smith's oxygen saturations dropped, and she was found to have an altered mental status of lethargy and decreased level of consciousness. The "Rapid Response Team" was called and she was given oxygen and two doses of naloxone (Narcan). Her oxygen levels and responsiveness improved, and she became "more awake." ([Filing No. 61-20](#); [Filing No. 61-21 at 1](#)–2; [Filing No. 61-19 at 3](#)–4.) It was noted that Smith had "[a]ltered mental status – 2/2 to morphine respiratory depression most likely given her improvement with narcan and oxygen." ([Filing No. 61-20 at 1](#).)

Around 7:00 a.m. on August 20, 2016, Dr. Tyler Smith checked on Smith. He noted that a rapid response had been called for Smith and that she had been administered naloxone with "good clinical response," but she still was "quite somnolent." He noted that her somnolence was likely secondary to her pain medications. Dr. Smith reviewed her laboratory results and noted an elevated creatinine level, so he requested an internal medicine consultation and instructed that Smith's medications be renally dosed ([Filing No. 61-22 at 1](#)–3). Later in the morning of August 20, 2016, Smith's oxygen saturations were "okay," but she was again unarousable, so she was transferred to the medical intensive care unit for increased evaluation and management ([Filing No. 61-23 at 1](#)–2). Internal medicine physician Dr. Utsav Goel noted that Smith's transfer to the medical intensive care unit for reduced arousability was "mainly due to her history of kidney disease . . . compounded with the administration of toradol and losartan post-operatively worsening the morphine clearance given the creatinine bump and GFR reduction." *Id.* at 2. Dr. Goel noted that additional testing was being pursued to rule out other processes. Dr. Goel ordered a continuous

naloxone infusion and instructed that Smith's medications be renally dosed in consultation with the pharmacy. *Id.*

Smith was transferred from the medical intensive care unit back to a medical unit on the morning of August 21, 2016 when her creatinine level had decreased to 1.6 mg/dL, and she was experiencing no confusion and her pain level was stable (Filing No. 61-25 at 1; Filing No. 61-26 at 1–2). By the morning of August 22, 2016, her creatinine level further decreased to 1.1 mg/dL, placing it within normal limits. She had been stable overnight and had no events during the day. Smith did experience more pain when she moved around more (Filing No. 61-28 at 1). On August 23, 2016, it was noted that Smith had no acute events, she was getting around better, and she was doing "well from hip perspective." (Filing No. 61-29 at 1.) Her record also indicated that her creatinine level was improving with a decrease to 0.9 mg/dL. *Id.* at 1–2.

On August 23, 2016, Smith was discharged from the hospital to return home. Her discharge note indicated that, during her hospital stay, she had "developed respiratory distress and acidosis post procedure and required monitoring in MICU. This was likely secondary to narcotics. [She] had elevation of creatinine or kidney function and [her] medications were adjusted." (Filing No. 61-30 at 1.) She was given tasks to perform until her post-operative follow-up appointment, and she was directed to keep her preset appointments. She was given some new prescriptions and directed to discontinue some other prescriptions, and some of her medication dosages were adjusted. *Id.* at 1–4.

Smith called the primary care clinic on August 29, 2016, and explained that she had been told by internal medicine that she needed to get an EKG and follow up with her primary care physician because she may have had a mild heart attack during an overdose (Filing No. 61-31 at

1). On August 30, 2016, a registered nurse scheduled Smith for an appointment in the primary care clinic for September 14, 2016. *Id.* at 2.

On September 9, 2016, Smith was seen in the orthopedics clinic for a post-operative appointment. She was walking well with a walker, and she was instructed to continue with her current therapy and to return to the orthopedics clinic in four weeks (Filing No. 61-32). On September 14, 2016, Smith was seen by primary care physicians Dr. Hongwei Liu and Dr. Iftiar Chowdhury. She was noted to be doing well following her discharge from the hospital with some hip pain with activity. Her creatinine level was within normal limits. She was ambulating with a walker, and her energy was improving. She did complain of chest pain that she had been experiencing for a few weeks (Filing No. 61-33 at 1–5). On October 6, 2016, Smith presented to NP Vandevender in the orthopedics clinic for another follow-up appointment. It was noted that Smith was continuing to improve following the surgery with some occasional pain in her hip. Smith asked about resuming her knee injections at her next visit to the orthopedics clinic (Filing No. 61-34).

On October 17, 2016, the VA received a Notice of Tort Claim from Smith, which asserted a claim for medical malpractice against the VA Hospital and requested $1,000,000.00 in damages. In her Notice of Tort Claim, Smith asserted that the VA Hospital's medical negligence led to her suffering hypercarbic respiratory failure, acute kidney injury, a small heart attack, anemia, dehydration, and acidosis with elevated creatinine "due to two different type[s] of morphine narcotic overdose." (Filing No. 61-35 at 1.)

On April 18, 2017, Smith filed a Complaint in this Court, asserting a claim for medical malpractice against the Defendant. She asserted that she was "administered an overdose of Morphine . . . . [She] passed out. She also had respiratory failure and kidney injury as a result of

the Morphine overdose/allergic reaction. . . . Despite the follow up treatment, the negligent administration of morphine has caused continuing medical problems for [her].” (Filing No. 21 at 2–3.)  After answering Smith's Complaint, the Defendant filed a Motion for Summary Judgment, arguing there is insufficient evidence to support a medical malpractice claim.

## II.    <u>SUMMARY JUDGMENT STANDARD</u>

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).  Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III.    DISCUSSION

The Defendant argues it is entitled to summary judgment on Smith's sole claim for medical malpractice because there is no evidence to establish the elements of breach and causation. In order to support a medical malpractice claim, "the plaintiff must prove three elements: (1) a duty on the part of the defendant in relation to the plaintiff; (2) a failure to conform his conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure." *Whitfield v. Wren*, 14 N.E.3d 792, 797 (Ind. Ct. App. 2014) (internal citation and quotation marks omitted). Causation may not be inferred from the allegation of a negligent act. *Midwest Commerce Banking Co. v. Livings*, 608 N.E.2d 1010, 1013 (Ind. Ct. App. 1993). Rather, to prove causation, a plaintiff must present specific facts that would demonstrate that the defendants allegedly negligent behavior caused the plaintiff's injuries. *Id.*; *see also Topp v. Leffers*, 838 N.E.2d 1027, 1032 (Ind. Ct. App. 2005) (quoting *Daub v. Daub*, 629 N.E.2d 873, 877 (Ind. Ct. App. 1994)) (proving proximate causation requires that the plaintiff show "'a reasonable connection between a defendant's conduct and the damages which a plaintiff has suffered'"). "A plaintiff must present expert testimony to establish the applicable standard of care and to show

whether the defendant's conduct falls below the standard of care." *Id.* (citing *Narducci v. Tedrow*, 736 N.E.2d 1288, 1292 (Ind. Ct. App. 2000)).

Before turning to the summary judgment motion, the Court will first address Defendant's Motion to Strike Smith's tendered January 29, 2019 expert report and Smith's request to exclude evidence.

**A.**     **Motion to Strike (Filing No. 67)**

The Defendant asks the Court to strike the "responsive/supplemental" report of Dr. Anthony Arata ("Dr. Arata"), which Smith emailed to the Defendant on January 29, 2019. The Case Management Order (and its amendments) set Smith's expert disclosure deadline for November 8, 2018, with the Defendant's expert disclosure deadline on December 14, 2018, and a dispositive motions deadline on January 18, 2019 (Filing No. 48; Filing No. 52). On November 8, 2018, Smith filed a one-page letter from Dr. Arata, which was identified as Dr. Arata's expert report (Filing No. 56; Filing No. 56-1). On December 14, 2018, the Defendant served its expert disclosures (Filing No. 57). On January 7, 2019, the Defendant filed its Motion for Summary Judgment. On January 29, 2019, Smith's counsel emailed to the Defendant a "responsive/supplemental" report from Dr. Arata (Filing No. 67-1). The Defendant asserts that Dr. Arata's second report is not a proper rebuttal report or a proper supplemental report, because it was provided eighty-two days after Smith's expert reports were due, and thus, the Court should strike it from the record.

Federal Rule of Civil Procedure 26(e)(1)(A) requires parties to supplement or correct their expert disclosures in a timely manner "if the party learns that in some material respect the disclosure…is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." *Id.*

Further, Rule 26(a)(2)(D) allows for rebuttal expert testimony, and "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party[,]" the disclosure must be made "within 30 days after the other party's disclosure." Fed. R. Civ. Pro 26(a)(2)(D). Rule 37(c) provides a sanction for a party who does not comply with these discovery rules. "[T]he party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. Pro. 37(c)(1).

Relying on a series of cases, the Defendant argues that Dr. Arata's second report is not a proper supplemental report; "an expert report that discloses new opinions is in no way a mere supplement to a prior report." *Trinity Homes, LLC v. Ohio Cas. Ins. Co. Grp.*, 2011 U.S. Dist. LEXIS 61701, at *9 (S.D. Ind. June 8, 2011). "Supplementation of an expert report permits a party to correct inadvertent errors or omissions. Supplementation, however, is not a license to amend an expert report to avoid summary judgment." *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 630 (E.D.N.C. 2008). Supplementation is appropriate when, "subsequent to the preparation of the original report, new information was discovered which required that the original report be supplemented because the original opinion was no longer correct." *Beller v. United States*, 221 F.R.D. 696, 701 (D.N.M. 2003).

The second report is nearly identical to the deficient, original report; except it adds the following two sentences: "It would be reasonable to say that a combination of morphine and the other sedating medications she was taking contributed to this event that she had on 8/20/16. It is generally understood in the medical community that mixing several sedating medications including morphine can have unintended negative respiratory consequences." (Filing No. 67-1 at 2.)

The Defendant argues that Dr. Arata's second report does not identify any new information, discovered after he issued his original report, which renders the original report no longer correct. In addition, the second report is not a proper rebuttal report because it does not even mention the Defendant's expert report, and it in no way contradicts, impeaches, or even responds to the Defendant's expert report. Rebuttal reports "cannot be used to advance new arguments or new evidence to support plaintiff's expert's initial opinions." *Larson v. Wis. Cent. Ltd.*, 2012 U.S. Dist. LEXIS 13057, at *10 (E.D. Wis. Feb. 3, 2012). "Thus, a party cannot offer testimony under the guise of 'rebuttal' only to provide additional support for his case in chief." *Bowman v. IBM*, 2012 U.S. Dist. LEXIS 178604, at *14 (S.D. Ind. Dec. 18, 2012) (internal citation and quotation marks omitted). Importantly, Rule 26(a)(2)(D) requires rebuttal expert testimony to be served within thirty days after the other party's disclosure, so if Smith intended for Dr. Arata's second report to rebut the Defendant's expert report, then Smith needed to serve Dr. Arata's report no later than January 14, 2019. However, she provided it fifteen days late and after the summary judgment motion already had been filed.

Smith responds that Dr. Arata's report should not be stricken or otherwise excluded because the two reports by Dr. Arata contain only "trivial differences." She asserts that the second report elaborates on what VA medical records were reviewed, elaborates on the effect of combining medications, and "adds state of art of medical knowledge." (Filing No. 73 at 7.) She further notes that the second report adds the inadvertently omitted curriculum vitae and statement of compensation from Dr. Arata. Smith asserts that the second report is a proper rebuttal report, and it should not be stricken as untimely. Relying on *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 615–16 (7th Cir. 2002), Smith argues that a court is not *required* to

strike a late expert report even where the party does not show that the late disclosure was justified or harmless.

Smith asserts there was no surprise or prejudice to the Defendant by Dr. Arata's second report because the second report merely elaborated on points made in the first report. Furthermore, the Defendant filed its summary judgment motion before the deadline passed for Smith to provide a rebuttal report. And if there is any prejudice, it can be cured and will not disrupt trial, which is scheduled for next year. The Defendant has plenty of time to depose Dr. Arata if it so chooses. Smith also argues there is no bad faith in the second report; rather the differences between the reports are a result of Smith's limited financial means, which provided for her expert only a limited review of the VA medical records and a limited amount of time to work on an expert report.

In reply to Smith's argument, the Defendant asserts that the "trivial differences" between the first report and second report are "precisely the problem" with the second report. "Smith seems to have intended Dr. Arata's November 8, 2018 report to be a 'first draft' of his final opinion. The Federal Rules of Civil Procedure, however, explicitly prohibit this type of maneuvering." (Filing No. 77 at 1.) "[E]xpert reports must be 'detailed and complete.'" *Salgado by Salgado v. GMC*, 150 F.3d 735, 741 n.6 (7th Cir. 1998). Smith failed to identify any new information discovered after the first report that would allow a second, supplemental report. The Defendant argues it would be prejudiced by the allowance of the second report because the Defendant moved for summary judgment based on the contents of the initial report. They argue that Smith simply has not met her burden of showing that her disregard of the discovery rules was either justified or harmless.

The Court determines that although Smith's violation of Rule 26(a) may not have been substantially justified, it was harmless. The Court accepts Smith's explanation that the second

report provides only "trivial differences" to "elaborate" on matters that were "inadvertently omitted" from the first report. The Court also accepts Smith's explanation that the differences between the reports are a result of her limited financial means, which provided her expert only a limited review of the VA medical records and a limited opportunity to give an expert report. (Filing No. 81-2.) Unlike the Plaintiff in *Dura*, whom the court determined was "a substantial firm rather than a hapless individual," the Court does not believe the failure to include the additional materials was strategic. *See Dura* at 616. In *Dura*, the suit was in its seventh year and to have reopened discovery would have extended the litigation, and burdened opposing counsel unreasonably. Here, Smith's failure to comply with the discovery rules will not extend this litigation and opposing counsel is not unreasonably burdened. The Defendant has responded adequately to the merits of Dr. Arata's second report and the Court finds no prejudice in considering it. Under these circumstances, the Court exercises "lenity" and **denies** the Motion to Strike.

**B.** <u>**Smith's Request to Exclude Evidence**</u>

In her response to the Motion for Summary Judgment, Smith asks the Court to exclude the Defendant's expert testimony from Dr. Kristen Spisak ("Dr. Spisak") because it is unreliable. Quoting from *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590–91 (1993), Smith explains that expert testimony must be "ground[ed] in the methods and procedures of science" and must "assist the trier of fact to understand or determine a fact in issue." Smith argues that, in determining whether an expert's methodology employed is reliable, a court may consider whether the expert has adequately accounted for obvious alternative explanations. "[T]his analysis may require [the District Court] to consider whether the expert has adequately show[n] why a particular

alternative explanation is not, in the expert's view, the sole cause of the [injury]." ([Filing No. 73 at 5](#) (quoting *Schultz v. Akzo Noble Paints*, 721 F.3d 426, 434 (7th Cir. 2013).)

Smith asserts that concurrent use of benzodiazepines and opioids can put patients at greater risk for potentially fatal overdose because benzodiazepines and opioids both cause central nervous system depression and can decrease respiratory drive. Smith's VA medical records indicate that she was taking a benzodiazepine at the time that she was given morphine and had the incident at the VA Hospital. She argues that Dr. Spisak's report concludes that the cause of Smith's respiratory distress was a "morphine-induced . . . unforeseeable side effect . . . [of] acute reduction in kidney function," but the "medical records also indicate that the cause of the respiratory distress was a narcotic overdose. Dr. Spisak's failure to consider this reasonable alternative theory of causation subjects her opinion to exclusion." ([Filing No. 73 at 6](#).) Smith also argues that Dr. Spisak's report is unreliable because the report noted it was reasonable to not give Smith acetaminophen because one of her listed allergies was acetaminophen/hydrocodone, but Smith was discharged from the VA Hospital with instructions to take acetaminophen. Smith further asserts that Dr. Spisak's report failed to adequately address her kidney function. Smith argues, with open and obvious omissions, the report is unreliable and should be excluded.

The Defendant responds,

> Dr. Spisak is a board-certified anesthesiologist who reviewed all of Ms. Smith's medical records. Her report, which she has adopted and sworn under penalties of perjury, sets forth her reasoning, as well as the bases for her conclusions. As such, she has satisfied the first prong of the *Daubert* analysis.

> Dr. Spisak's testimony also satisfies the second, relevance, prong of the *Daubert* analysis because it squarely addresses the key issue of this case – whether the medical care and treatment that Ms. Smith received during her August 2016 hospitalization at the VA Hospital met the standard of care.

Because Dr. Spisak is qualified to offer expert testimony in this matter, and because her testimony is scientifically valid and will assist the Court in addressing the key issue of this case, the Court should not exclude her testimony.

([Filing No. 78 at 4](#)–5 (internal citations omitted).)

Upon review of Dr. Spisak's expert report, the Court concludes that her report satisfies the criteria of Federal Rule of Evidence 702 as well as *Daubert*'s guidance concerning reliability and relevance. Dr. Spisak is a medical doctor of twelve years, with years of post-graduate training and work experience. She undertook a comprehensive review of Smith's medical records and then based her opinions on those records and her education, experience, and training.

Smith's argument about Dr. Spisak's expert opinion concerning acetaminophen is unavailing and is based on Smith's selective quotation from the expert report. The expert report actually indicates that Dr. Spisak adequately considered acetaminophen:

> I have no disagreement with Dr. Arata's statement that it would have been "reasonable" to have considered acetaminophen or other pain medications during Ms. Smith's August 2016 hospitalization, however, it was also entirely reasonable, and was not a breach of the standard of care, to have used morphine SR and morphine IR for Ms. Smith's post-operative pain control. Additionally, one of Ms. Smith's listed allergies is acetaminophen/hydrocodone, to which she has swelling, increased heart rate, and itching. Therefore, it is also reasonable that acetaminophen was intentionally not given based on the patient's allergy history.

([Filing No. 61-38 at 3](#).) Nothing in this opinion makes Dr. Spisak's expert report unreliable as she considered various alternatives and formed her medical opinion based on the medical records and her education, training, and experience.

Concerning Smith's argument about her respiratory distress being a morphine-induced, unforeseeable side effect, the Court determines that Dr. Spisak's medical opinion is consistent with the medical records and also can be harmonized with Smith's phraseology that the cause of the respiratory distress was a "narcotic overdose". Dr. Spisak's expert report opines,

Ms. Smith's lethargy and respiratory distress prior to the Rapid Response event was the result of morphine-induced respiratory depression due to her underlying kidney disease. Ms. Smith experienced an acute reduction in kidney function post-operatively, possibly from post-operative anemia or poor oral or intravenous fluid intake, though the definitive etiology is unclear. As a result of her acute reduction in kidney function, renal clearance of morphine was impaired, which led to an accumulation of the drug in her serum. This was an unforeseeable side effect and does not represent a breach or deviation from the standard of care.

(Filing No. 61-38 at 3.) Dr. Spisak's opinion regarding "an accumulation of morphine in [Smith's] serum" and "morphine-induced respiratory depression" can be harmonized with Smith's choice of words: a "narcotic overdose." One choice of words does not rule out the other. Dr. Spisak's opinion and her choice of words are consistent with the medical records.

Quoting from *Schultz*, 721 F.3d at 434, Smith argues that *Daubert* and Rule 702 require the Defendant to show why "a particular alternative explanation is not, in the expert's view, the sole cause of the [injury]." However, the full quotation from *Schultz* provides,

[A] court may consider whether the expert has adequately accounted for obvious alternative explanations. That consideration should show why a particular alternative explanation is not, in the expert's view, the sole cause of the disease. Beyond that, while *Myers* and the Committee Notes suggest that a reliable expert should consider alternative causes, they do not require an expert to rule out every alternative cause.

*Id.* (internal citations and quotation marks omitted). Dr. Spisak's opinion sufficiently considered alternative causes based on the medical records she was given, and she was not required to rule out every alternative cause before the Court can determine her opinion to be reliable.

Because the Court concludes that Dr. Spisak's expert report satisfies the criteria of Rule 702 as well as *Daubert*'s guidance concerning reliability and relevance, Smith's request to exclude Dr. Spisak's report is **denied**.

C.    **Motion for Summary Judgment**

Smith argues that the VA physicians breached the standard of care for her treatment by giving her "an overdose of Morphine" which has caused her "continuing medical problems." ([Filing No. 1 at 3](#)).  The Defendant believes it is entitled to summary judgment on Smith's medical malpractice claim because Smith's expert medical opinions do not establish the standard of care, a breach of that standard, and causation. The Defendant asserts that it has provided the only competent medical evidence, which establishes that the standard of care was not breached.

Because the events giving rise to this claim occurred in Indiana, Indiana medical malpractice law applies.  In order to bring a claim in Indiana for medical malpractice, Smith must "establish that the Defendant (1) owed her a duty of care; (2) breached its duty by conduct falling below the standard of care; and (3) proximately caused a compensable injury through the breach of duty."  See *Musser v. Gentiva Health Svcs.*, 356 F.3d 751, 760 (7th Cir. 2004). Except in those cases where deviation from the standard of care is a matter commonly known by lay persons, expert medical testimony is necessary to establish whether a physician has or has not complied with the standard of a reasonably prudent physician.  *Culbertson v. Mernitz*, 602 N.E.2d 98, 104 (Ind. 1992).  "Cases which do not require expert testimony generally involve the physician's failure to remove surgical implements or foreign objects from the patient's body."  *Simms v. Schweikher*, 651 N.E.2d 348, 350 (Ind. Ct. App. 1995).  "The question of the appropriate standard of care may not be resolved without resort to expert testimony.  The [plaintiff is] required to present expert testimony establishing the standard of care and that [the defendant's] conduct fell below this standard."  *Marquis v. Battersby*, 443 N.E.2d 1202, 1203 (Ind. Ct. App. 1982).

Moreover,

The law requires that a physician treating a patient possess and exercise that degree of skill and care ordinarily possessed and exercised by a physician treating such maladies in the same or similar locality. In order for a lay jury to know whether a

physician complied with the legally prescribed standard of care, expert testimony has generally been held to be required.

*Culbertson* at 100 (Ind. 1992).

The Defendant points to two Indiana Court of Appeals decisions to assert that a physician is only required to exercise reasonable and ordinary medical skill, and a physician is not required to guarantee a cure or a favorable outcome:

> A physician is not an insurer and does not bind himself to make a correct diagnosis and effect a cure at the risk of responding in damages. He is bound only to reasonable and ordinary skill and administering reasonable and ordinary care. A physician is excused from liability, if, possessing reasonable skill, he has used ordinary care in conducting an examination and has reached the mistaken conclusion and result by the use of such skill and care. Mere proof that a diagnosis is wrong or that a cure was not effected will not support a verdict for damages.

*Broughton v. Riehle*, 512 N.E.2d 1133, 1137 (Ind. Ct. App. 1987).

> Medicine is an inexact science and serious complications, even death, arising from the practice thereof should not in most situations be properly chargeable to a physician without proof of some negligent act. To hold otherwise would require physicians to insure rapid and proper recovery by their patients from any and all surgical and postoperative treatment.

*Carpenter v. Campbell*, 271 N.E.2d 163, 166 (Ind. Ct. App. 1971).

The Defendant argues that Dr. Arata's January 29, 2019 report does not opine that any employee of the United States breached the standard of care during Ms. Smith's August 2016 hospitalization. Dr. Arata states that Ms. Smith's "respiratory suppression was most likely primarily due to the morphine she was given" and "it would have been reasonable to have considered [acetaminophen] or other non-narcotic forms of medications to achieve pain control during [Ms. Smith's] hospitalization." (Filing No. 67-1 at 1; Filing No. 73-9 at 1.) Defendant argues this statement is not enough to establish a breach of the standard of care. *See, e.g.*, *Oelling v. Rao*, 593 N.E.2d 189, 190-91 (Ind. 1992) (concluding that affidavit from plaintiffs' medical expert did not establish a breach of the standard of care when the affidavit "state[d] only that *he*

would have treated [plaintiff] differently, not that [defendant's] treatment fell below the applicable standard"); *St. Mary's Ohio Valley Heart Care, LLC v. Smith*, 112 N.E.3d 1144, 1152 (Ind. Ct. App. 2018) (reversing denial of summary judgment because plaintiff, whose expert provided testimony "in terms of what he would have done differently or what [defendant] should have done," had not met his burden of "definitively and unequivocally demonstrat[ing] what the standard of care [was] and that [defendant] breached it"); *Mundy v. Angelicchio*, 623 N.E.2d 456, 462 (Ind. Ct. App. 1993) ("To place the issue of negligence in controversy, a medical expert must testify that the defendant's treatment fell below the applicable standard of care and not merely that he would have treated the patient differently."); *see also Kranda v. Houser-Norborg Med. Corp.*, 419 N.E.2d 1024, 1043 (Ind. Ct. App. 1981) (stating that testimony that a doctor has not performed a procedure in a certain way does not support a finding of malpractice when there is no evidence that the injury would not have occurred but for the negligence).

In addition, Defendants argue that Dr. Arata has not opined that Smith's August 2016 hospitalization caused any of her current medical problems. They note that  Dr. Arata expresses no opinions, and that their expert, Dr. Spisak, has not linked any of Smith's continuing medical problems to her August 2016 hospitalization. (Filing No. 61-37 and Filing No. 61-38).

Smith asserts, "In this case, Dr. Arata's report stated that combining sedating medications could result in respiratory distress, that this connection was known, and that an alternative was available. She argues that a medical malpractice lawsuit does not require the use of "magic words" to establish the standard of care, breach, and causation. Smith contends that while Dr. Arata does not use the 'magic words,' his report is sufficient to allege a breach of standard of care." (Filing No. 73 at 11.)

The Court is not persuaded. In order to preclude summary judgment, Smith had to present expert testimony establishing that "the expert is familiar with the proper standard of care under the same or similar circumstances, what that standard of care is, and that the defendant's treatment of the plaintiff fell below that standard of care." *Lusk*, 753 N.E.2d at 753. In this case, Smith presented Dr. Arata's January 2019 report as well as two peer-reviewed medical articles concerning concurrent use of benzodiazepines and opioids. These materials do not establish the standard of care that must have been followed in the treatment of Smith following her hip replacement surgery. Instead, these materials provide an alternative treatment course that could have been pursued, not a *breach* of *the* standard of care in this case.

To survive summary judgment in a medical malpractice case, a plaintiff needs to provide expert testimony that "definitively and unequivocally demonstrate[s] what the standard of care is and that [the defendant] breached it," not just "what [the plaintiff's expert] would have done differently or what [the defendant] should have done." *St. Mary's Ohio Valley Heart Care, LLC v. Smith*, 112 N.E.3d 1144, 1152 (Ind. Ct. App. 2018). Dr. Arata stated only that "it is generally understood in the medical community that mixing several sedating medications including morphine can have unintended negative respiratory consequences." (Filing No. 73-9). This statement does not establish a standard of care, or direct that doctors must never "mix several sedating medications." If the plaintiff's expert "states only that *he* would have treated [the plaintiff] differently, not that [the defendant's] treatment fell below the applicable standard," then the plaintiff has failed to meet her burden. *Oelling v. Rao*, 593 N.E.2d 189, 190–91 (Ind. 1992) (emphasis in original). Here, Smith has failed to carry her burden of designating expert testimony to demonstrate a dispute regarding the standard of care, breach, and causation.

Regarding Smith's personal opinions as to the standard of care and causation, the Defendant points out that Smith has no medical training (*see* Filing No. 61-36 at 8), so her personal belief that her medical problems are the result of an overdose of morphine during her August 2016 hospitalization cannot establish a breach of the standard of care or causation. On the other hand, Defendant's expert, Dr. Spisak, reviewed Smith's medical records and opined that there was no breach of the standard of care during Smith's August 2016 hospitalization. Dr. Spisak also opined that Smith's post-operative pain management was reasonable and complied with the standard of care (Filing No. 61-37 at 1–2; Filing No. 61-38 at 3). Dr. Spisak opined that other medications could have been considered to manage Smith's post-operative pain; however, it was "entirely reasonable, and was not a breach of the standard of care, to have used morphine SR and morphine IR for Ms. Smith's post-operative pain control." (Filing No. 61-38 at 3.)

Smith responds that the Defendant's argument is unavailing because Dr. Spisak's opinion should be excluded and because she presented two peer-reviewed medical articles concerning concurrent use of benzodiazepines and opioids as well as Dr. Arata's report, which suggested "an alternative cause which is foreseeable, and which Dr. Spisak did not consider." (Filing No. 73 at 9.) The Court reiterates that Dr. Spisak's report is not excluded and Dr. Spisak did consider alternatives, opined that those alternatives were reasonable, and further opined that the Defendant's course of action also was a reasonable alternative that did not fall below the standard of care.

In considering the parties' arguments regarding standard of care, breach, and causation, the Court is mindful that, "[b]ecause of the complex nature of medical diagnosis and treatment, expert testimony is generally required to establish the applicable standard of care." *Lusk v. Swanson*, 753 N.E.2d 748, 753 (Ind. Ct. App. 2001). In cases where expert testimony is not required, "[t]he

rationale underlying these cases is that the facts themselves are sufficient to raise an inference of negligence without expert testimony." *Simms*, 651 N.E.2d at 350. The Court cannot say that a layperson could infer, based solely on the facts of the case, that the Defendant was negligent in administering morphine as one part of a multimodal pain treatment plan following Smith's surgery. Thus, Smith was required to present expert medical testimony raising a genuine factual dispute concerning standard of care, breach, and causation. Smith's own interpretation of her medical records or of medical journal articles is not enough to avoid summary judgment. As such, the Defendant is entitled to summary judgment on Smith's medical malpractice claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant the United States of America's Motion for Summary Judgment (Filing No. 61) and denies the Motion to Strike (Filing No. 67). Plaintiff Marie Smith's claim for medical malpractice is **dismissed**, and the trial is **vacated**. Final judgment will issue under separate order.

**SO ORDERED.**

Date: 9/17/2019

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Adam Lenkowsky
ROBERTS LITIGATION GROUP
alenkowsky@robertslitigation.com

Rachana Nagin Fischer
UNITED STATES ATTORNEY'S OFFICE
rachana.fischer@usdoj.gov

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov